This Opinion is a
Precedent of the TTAB

Oral Hearing: March 18, 2014                    Mailed: August 17, 2015

## UNITED STATES PATENT AND TRADEMARK OFFICE
### Trademark Trial and Appeal Board

————

*Anheuser-Busch, LLC*

*v.*

*Innvopak Systems Pty Ltd.*

————

Opposition No. 91194148
to Application No. 79065427
filed: January 21, 2009

————

Andrea Anderson and Alexander J.A. Garcia of Holland & Hart LLP for Opposer.

William Seiter of Seiter & Co. for Applicant.

————

**Before Seeherman, Mermelstein, and Kuczma, Administrative Trademark Judges.**

**Opinion by Mermelstein, Administrative Trademark Judge:**

Innvopak Systems Pty Ltd. filed an application[1] to register the mark **WINEBUD**

(in standard characters) for

> alcoholic beverages except beers; wines and still wines and
> sparkling wines; beverages containing wine, namely, spar-
> kling fruit wine and still fruit wine; ready to drink alcoholic
> beverages except beers

in International Class 33. Anheuser-Busch, LLC, opposed registration, alleging both a

---

[1] The subject application is a request for extension of protection of International Reg. No. 0993595, pursuant to the Madrid Protocol, Trademark Act § 60, *et. seq.*, 15 U.S.C. § 1141, *et seq*. The International Registration date is Jan. 21, 2009, and the USPTO was notified of the request for extension on March 12, 2009. Pursuant to Trademark Act § 67, 15 U.S.C. § 1141g, Applicant claims a priority date of July 21, 2008.

likelihood of confusion and dilution in view of Opposer's registrations and prior use of the mark **BUD** and several **BUD–** formative marks for beer. Applicant denied the salient allegations of the notice of opposition.

For the following reasons we sustain the opposition.

## I. Description of the Record

The record comprises the pleadings and the file of the opposed application. Trademark Rule 2.122(b). In addition, the parties proffered the following items:

### A. Opposer's Evidence

- Testimony of Robert Fishbeck, Senior Program Manager, Budweiser Brands, Anheuser-Busch, LLC. Dec. 9, 2011, 38 TTABVue (confidential) & 39 TTABVue (redacted public version).

  - Declaration of Robert Fishbeck, April 19, 2011. Filed as Exhibit 1 to Mr. Fishbeck's testimonial deposition,[2] beginning at 39 TTABVue 120.

- Testimony of Edward A. Blair, Ph.D. Dr. Blair conducted a likelihood of confusion survey taken on behalf of Opposer, a copy of which was identified and introduced as an exhibit to his testimony. Dec. 15, 2011, 37 TTABVue.

- Opposer's First Notice of Reliance: Documents evidencing the status and title of Opposer's pleaded registrations. Dec. 13, 2011, 25 TTABVue.

- Opposer's Second Notice of Reliance: Third-party registrations in which a single mark is registered for both beer and wine. Dec. 13, 2011, 26 TTABVue.

- Opposer's Third Notice of Reliance: The file of a third-party application and several TTAB and court decisions, submitted by Opposer to show the fame of its marks. Dec. 13, 2011, 27 TTABVue.

- Opposer's Fourth Notice of Reliance: Newspaper and periodical articles covering

---

[2] In his testimony, Mr. Fishbeck identified his prior declaration (made in support of Opposer's motion for summary judgment), and confirmed that the statements made in it were "true to the best of [his] knowledge." *Fishbeck Test.*, 39 TTABVue 9–10. *See Levi Strauss & Co. v. R. Josephs Sportswear Inc.*, 28 USPQ2d 1464, 1465 n. 2 (TTAB 1993) (declaration previously filed in connection with summary judgment motion, which was introduced as an exhibit during testimony by the witness/declarant, who confirmed its accuracy, is part of record).

the years 1990–2011, submitted to "illustrat[e] the widespread renown, recognition, and fame of the BUD Family of Marks." Dec. 13, 2011, 28–31 TTABVue.

- Opposer's Fifth Notice of Reliance: A poem and the lyrics of a number of songs, all mentioning Opposer's products, submitted to "show the widespread renown, recognition, and fame of the BUD Family of Marks." Dec. 14, 2011, 32 TTABVue.

- Opposer's Sixth Notice of Reliance: Five third-party registrations and information from four websites submitted to "illustrat[e] a branding convention placing a generic term first and a dominant term second." Dec. 16, 2011, 33 TTABVue.

- Opposer's Seventh (Rebuttal) Notice of Reliance: Search results pages from four online dictionaries, showing no listing for the terms "vinebud" or "vine bud." March 29, 2012, 36 TTABVue.

## B. Applicant's Evidence

- Applicant's Notice of Reliance. Feb. 21, 2012, 34 TTABVue (confidential) & 35 TTABVue (redacted).

  o Article from *Wine Business Monthly*, submitted to "establish[] that the term 'vine bud' is a recognized term in the field of viticulture."

  o Definition from an online dictionary, submitted to "show[] that the term 'wine' is a common noun of Old English derivation."

  o Definition from an online dictionary, submitted to "show[] that the term 'bud' is a common noun of Old English derivation."

  o Definition from an online dictionary submitted to "show[] that the term 'Budweiser' is the name of a style of lager beer, similar to pilsner, from the city of České Budějovice in Bohemia (Czech Republic), derived from the German name for the town, Budweis."

  o Name and address listings of seven individuals with the surname "Budweiser" from 411.com, submitted to "establish[] that the term 'Budweiser' is a surname."

  o Definition from an online dictionary offered to "show[] that the term 'hotel' is a common noun of 18th century French origin."

  o Definition from an online dictionary offered to "show[] that the term 'restaurant" is a common noun of 18th century French origin."

  o Report from the Centers for Disease Control and Prevention on alcohol use, offered to demonstrate that "the total number of respondents participating in

> [Opposer's] survey … is an infinitesimal number of consumers of beer and wine products."

- o Opposer's responses to Applicant's first set of interrogatories.

- o Opposer's responses to Applicant's second set of interrogatories.

## II. Parties

Opposer Anheuser-Busch began brewing beer in the United States more than 150 years ago, and first sold its flagship product under the **BUDWEISER** brand in 1876. Although nineteenth-century brewing was typically a local affair, Opposer's technical innovations, including the early use of pasteurization and refrigerated railcars, allowed it to distribute its beer regionally and by the turn of the twentieth century, nationally. *Fishbeck Test.*, 39 TTABVue 11–12. While Opposer's beer was originally sold under the **BUDWEISER** brand, customers soon began to abbreviate the mark, calling for **BUDWEISER** beer just by the name "**BUD**." *Id.*, 39 TTABVue 12–13; *see In re SL&E Training Stable Inc.*, 88 USPQ2d 1216, 1219 (TTAB 2008) (discussing the propensity of customers to shorten trademarks). Opposer embraced the nickname in its advertising as early as 1895, *Fishbeck Test.,* 39 TTABVue 13, and has sold and heavily promoted its beer under the **BUD** mark since the 1950s. *Fishbeck Test.*, 39 TTABVue 12–13. Except for the years during which the production and sale of alcoholic beverages was prohibited by the Eighteenth Amendment (1920–1933),[3] Opposer continuously produced, advertised, and sold beer under the **BUDWEISER** and **BUD** trademarks (and marks comprising those terms), and continues to do so today. *Id.*

---

[3] During Prohibition, Opposer sold non-alcoholic beer under the **BUDWEISER** mark. *Fishbeck Dec.* ¶ 2, 39 TTABVue 120.

Over the years, Opposer obtained trademark registrations for **BUDWEISER**, **BUD,** and several variations. In this proceeding, Opposer offered the following registrations in evidence. *Opp. First Not. of Reliance*, Exh. 1–8, 25 TTABVue 6–53.[4]

| Reg. No. | Mark | Goods | Registered | Disclaimer |
|---|---|---|---|---|
| 666367 | **BUD** | Beer | Aug. 26, 1958 | |
| 952277 | **BUDWEISER** | Beer and malt Liquor | Jan. 30, 1973 | |
| 999817 | **BUD MAN** | Beer | Dec. 17, 1974 | |
| 1261873 | **BUD LIGHT** | Beer | Dec. 20, 1983 | "light" disclaimed |
| 1567443 | **BUD BOWL** | Beer | Nov. 21, 1989 | |
| 1567446 | **BUD DRY** | Beer | Nov. 21, 1989 | "dry" disclaimed |
| 3011229 | **BUDWEISER SELECT** | Beer | Nov. 1, 2005 | "select" disclaimed |

Opposer's evidence establishes that the listed registrations are valid and subsisting, and that Opposer is the owner of each of them.

The record reveals relatively little about Applicant (Applicant submitted no testimony), except that it is incorporated and does business in Australia, and that it seeks registration of **WINEBUD** for use on wine, and more generally, alcoholic beverages other than beer. The application was filed pursuant to the provisions of the Madrid Protocol, Trademark Act § 66, 15 U.S.C. § 1141f, which does not require use of the mark in United States commerce as a condition of registration. There is no evidence in the record of Applicant's use of **WINEBUD** on such goods in the United States or elsewhere, but Applicant has declared its *bona fide* intent to use the mark in United States commerce. *See* Trademark Act § 66(a).

---

[4] The notice of reliance included an additional registration, No. 3259179 for **BUD EXTRA.** This registration was in force when Opposer's notice of reliance was submitted, but was cancelled on February 7, 2014, for failure to file an affidavit of continuing use pursuant to Trademark Act § 8. An expired or cancelled registration is evidence of nothing but the fact that it once issued. *Sunnen Prods. Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1747 (TTAB 1987).

### III. Standing

To establish its standing, Opposer must prove that it has a real interest in the outcome of this proceeding and a reasonable basis for its belief that it would be damaged by issuance of a registration of the mark to Applicant. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982); *Time Warner Entm't Co. v. Jones*, 65 USPQ2d 1650 (TTAB 2002). In light of its pleaded ground of likelihood of confusion, Opposer's submission of its trademark registrations adequately establish its interest in this proceeding and a reasonable basis for its belief that damage would result from registration of Applicant's mark. Having established its standing with respect to its likelihood of confusion claim, Opposer need not separately show its standing to assert its claim of dilution. *See, e.g.*, *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1377, 101 USPQ2d 1713, 1727-28 (Fed. Cir. 2012) ("once an opposer meets the requirements for standing, it can rely on any of the statutory grounds for opposition set forth in 15 U.S.C. § 1052."); *Liberty Trouser Co. v. Liberty & Co.*, 222 USPQ 357, 358 (TTAB 1983).

### IV. Likelihood of Confusion

#### A. Priority

Because Opposer has established ownership of a number of valid and subsisting trademark registrations, priority is not an issue with respect to the registered marks and the goods identified in the respective registrations. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974). Further, Mr. Fishbeck's testimony and associated exhibits establish Opposer's continuing use in the United States of its **BUDWEISER** and **BUD** marks (and variants) for beer since long

6

prior to Applicant's July 21, 2008, priority date. Accordingly, we find that Opposer's evidence clearly establishes its priority with respect to its use of **BUDWEISER** and **BUD** on beer. Trademark Act § 2(d).

### B. Relevant *du Pont* Factors

Trademark Act § 2(d) bars registration of a mark

> which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive. . . .

Our determination under Trademark Act § 2(d) is based on an analysis of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *See In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). Opposer bears the burden of proving its claim of likelihood of confusion by a preponderance of the evidence. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1848 (Fed. Cir. 2000).

### A. The Fame of the Prior Mark (Sales, Advertising, Length of Use)

We begin by considering the fame or strength of Opposer's marks. Fame, when found, is entitled to great weight in a likelihood of confusion analysis. *See Bose Corp. v. QSC Audio Prods. Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Recot Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992). As the court of appeals has held, the "[f]ame of an opposer's mark or marks, if it exists, plays a 'domi-

nant role in the process of balancing the *du Pont* factors,'" and "[f]amous marks . . . enjoy a wide latitude of legal protection." *Bose*, 63 USPQ2d at 1305 (quoting *Recot*, 54 USPQ2d at 1456). "A strong mark . . . casts a long shadow which competitors must avoid." *Kenner Parker*, 22 USPQ2d at 1456. A famous mark is one that has extensive public recognition and renown. *Bose*, 63 USPQ2d at 1305. In assessing fame, we consider all relevant evidence, including sales under the mark, advertising, and length of use of the mark. *du Pont*, 177 USPQ at 567.

This record leaves no doubt that Opposer's **BUD** and **BUDWEISER** marks meet the applicable standard for fame. As already noted, Opposer has used its **BUDWEISER** mark on beer since 1876, interrupted only by Prohibition. Opposer's beer has been known as **BUD** since about 1895, and Opposer has heavily advertised its products under that mark for at least fifty years.

Mr. Fishbeck testified about Opposer's advertising of beer under its **BUDWEISER** and **BUD** marks (and variations), identifying and discussing a number of print and outdoor advertisements from the company's archives which have been used from the 1950s to the present. *Fishbeck Test.*, 39 TTABVue 18–31, Exh. 3. From the 1950s on, Opposer also advertised heavily on television and radio, particularly during sporting events. *Id.* at 20, 33. Among Opposer's successful advertising campaigns were the "Bud Bowl" commercials which aired in connection with the NFL Super Bowl games for about ten years, *id.* at 25–26, the "Bud Man" ads (1980s), *id.* at 24–25, "(For All You Do) This Bud's For You" (1970s–1980s), *id.* at 22–23, Exh. 3, "where there's life, there's BUD" (late 1950s to early 1960s), *id.* at 20, Exh. 3, "just ask for Bud," *id.* at 19, Exh. 3

(1950s), and "that Bud . . . that's <u>beer</u>!" (mid-1960s) *id.* at 21, Exh. 3. Advertisements using these and other marketing campaigns frequently appeared and continue to appear in both local and national print media, radio and television commercials, and outdoor advertisements. *E.g., id.* at 14, 18–21, 32.

In addition to traditional print, radio, and television advertising, Opposer has long been a major sponsor of high-profile sporting events, including golf, hockey, volleyball, and lacrosse. Opposer has been an official sponsor of the heavily watched Olympic games and World Cup Soccer games. *Fishbeck Dec.,* ¶¶ 19–23, 39 TTABVue 124–126. For the past "two to three decades" Opposer's marks have been exposed to the public through Opposer's sponsorship of NASCAR auto racing teams. *Fishbeck Test.*, *id.* at 29–30. Commonly referred to as the "Bud car" by television and track announcers, the car sponsored by Opposer is emblazoned with the **BUD** mark and slogans like **GRAB SOME BUDS**. *Id.* at 31, 35–41, Exh. 4 & 5. Opposer has also made extensive use of point-of-sale advertisements to promote its branded products in grocery stores, convenience stores, bars, and other places where beer is purchased. Opposer's point of sale materials have included signs, banners, displays, coasters, table tents, and cooler stickers. *Id.* at 22, 26–27, 37. In addition to its own promotional activities, Opposer and its products have frequently been the subject of unsolicited media attention, *Opp. Fourth Not. of Reliance*, 28–31 TTABVue, Exh. 1–22 (numerous newspaper and magazine articles), and have even appeared in poetry and popular songs, *Opp. Fifth Not. of Reliance*, 32 TTABVue 6–42.

Mr. Fishbeck testified and submitted evidence about Opposer's advertising expend-

itures for the years 2006–2010.[5] *Fishbeck Test.*, 38 TTABVue 9–10, 25. Although this testimony and the associated exhibit were submitted under seal, we can describe Opposer's expenditures to promote its branded products in the United States as substantial. Those efforts have been highly successful; according to Opposer's testimony, **BUD LIGHT** is the best-selling beer in the United States (and worldwide), followed by Opposer's **BUDWEISER** beer, which is the second best. In fact, **BUD LIGHT** and **BUDWEISER** have occupied the first and second spots in the United States for about twenty years. *Fishbeck Test.*, 39 TTABVue 79–80; *Fishbeck Dec.* ¶ 24, 39 TTABVue 126. Altogether, beer sold under the **BUDWEISER** and **BUD** marks (and variations) account for thirty percent of the domestic market. *Fishbeck Test*, 39 TTABVue 80. Mr. Fishbeck testified about Opposer's revenue from its wholesale distribution of beer for the years 2006–2010. *Fishbeck Test.* 38 TTABVue 14, 27. This evidence was also submitted under seal, but suffice it to say that sales under the **BUD** and **BUDWEISER** marks alone — as well as the aggregate sales for all of the **BUD-** formative marks — have been extremely large.

Applicant does not deny or even address Opposer's contention that its **BUDWEISER** and **BUD** marks are famous. But for a quotation from Opposer's brief, Applicant's only mention of the asserted fame of the **BUD** and **BUDWEISER** marks is the statement that "[e]ven were the Board to conclude that Opposer's marks are famous, there would . . . remain genuine issues of material fact regarding the similarity

---

[5] Discovery closed in February 2011 and Opposer's testimony period concluded the following December.

of the marks."[6] *App. Br.*, 41 TTABVue 14–15. Applicant has not presented any evidence or argument to refute or cast doubt on Opposer's evidence of fame.

There is more in the record, but we need not belabor the point. To prove that a mark is famous requires a significant evidentiary showing. As the Board has often said, "it is the duty of the party asserting that its mark is famous to clearly prove it." *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594, 1597 (TTAB 2009). Nonetheless, Opposer's evidence meets this standard and leaves us with no doubt that its long use and heavy promotion of its **BUDWEISER**, **BUD**, and related marks, and the very strong commercial success of its branded products, compel a finding that these marks are famous for beer. Although fame is "insufficient, standing alone, to establish likelihood of confusion," *Coach Servs.*, 101 USPQ2d at 1720 (citing *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983)), a finding of fame puts a heavy thumb on Opposer's side of the scale.[7]

---

[6] The "genuine issues of material fact" standard applies to motions for summary judgment. *See* FED. R. CIV. P. 56(a). Now that the parties have tried and briefed the case, the question is not whether factual issues remain to be tried, but whether Opposer has established its case by a preponderance of the evidence.

[7] Noting Opposer's long and extensive use of its marks on beer (and not wine), Applicant seems to suggest that the very strength of Opposer's mark makes confusion *less* likely. *App. Br.*, 41 TTABVue 14. The Federal Circuit has squarely rejected such arguments:

> While scholars might debate as a factual proposition whether fame heightens or dulls the public's awareness of variances in marks, the legal proposition is beyond debate. The driving designs and origins of the Lanham Act demand the standard consistently applied by this court — namely, more protection against confusion for famous marks.

*Kenner Parker*, 22 USPQ2d at 1456. In other words, the fact that a mark is famous can never diminish the scope of protection afforded it.

**B. The Similarity or Dissimilarity of the Marks in their Entireties as to Appearance, Sound, Connotation and Commercial Impression**

In a likelihood of confusion analysis, we compare the marks for similarities and dissimilarities in appearance, sound, connotation and commercial impression. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). "The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs.*, 101 USPQ2d at 1721 (citation and internal quotation marks omitted). While it is appropriate to accord greater importance to the more distinctive elements in the marks, we must consider the marks in their entireties. *E.g.*, *Juice Generation, Inc. v. GS Enters. LLC*, — F.3d —, 2015 WL 4400033, at *6 (Fed. Cir. July 20, 2015) ("While the Board may properly afford more or less weight to particular components of a mark for appropriate reasons, it must still view the mark as a whole. The Board did not err in giving less emphasis to the word JUICE when it noted that the term is generic.") (citing *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable.")).

Applicant's mark is **WINEBUD**. The mark in Opposer's '367 Registration[8] is **BUD**.

---

[8] We focus primarily on Opposer's '367 Registration for **BUD**, as it is most similar to the ap-

(continued...)

To state the obvious, Applicant's **WINEBUD** mark is similar to Opposer's **BUD** mark in that it incorporates the entirety of Opposer's mark. On the other hand, **WINEBUD** differs from **BUD** because it adds the word "wine" before "bud." Because both marks are presented in typed or standard character form, each could be used in any typeface, color, or size, including the same stylization actually used or intended to be used by the other party, or one that minimizes the differences or emphasizes the similarities between the marks. *See Citigroup Inc. v. Capital City Bank Group Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1258–59 (Fed. Cir. 2011).

Opposer argues that "wine" is generic for Applicant's identified goods, *Opp. Br.*, 40 TTABVue 25, 34, (which include "wines"), and that "consumers are accustomed to the common branding convention" of placing a generic term in the first position of the mark followed by the source-identifying term, *id.* at 19, and that "they are likely to conclude that **WINEBUD** is a wine produced by the makers of **BUD**. . . ." *Id.* at 34.

By contrast, Applicant contends that the marks are "highly dissimilar in appearance, sound, connotation and commercial impression." *App. Br.*, 41 TTABVue 9. Focusing on the meaning of the marks, Applicant contends that "[v]ine bud is a recognized term in the field of viticulture." *App. Br.*, 41 TTABVue 9 (internal quotation marks and citations omitted). According to Applicant, "wine" and "bud" are both nouns of Old or Middle English derivation, and "**WINEBUD** is thus a fanciful compound noun formed from the nouns WINE and BUD, an analogy to horticultural words such as 'rosebud.'"

---

plied-for mark. If confusion is not found likely in view of Opposer's use and registration of **BUD**, a different result would not obtain with respect to Opposer's other pleaded marks, each of which includes additional elements not present in Applicant's mark.

*Id.* at 10.

As opposed to the asserted "viticultural roots" of its own mark, Applicant contends that Opposer's **BUDWEISER** mark has a different connotation, because:

> **BUDWEISER** is a town[9] in the Czech Republic (former Bohemia) famed not at all for viticulture, yet famed very much for brewing beer. Webster's online dictionary defines Budweiser as "the name of a style of lager beer (similar to pilsner) from the city of České Budějovice in Bohemia (Czech Republic), brewed since 1265. Its name is derived from the German name for the town, Budweis (something from Budweis being a Budweiser). . . . This dictionary definition of the term Budweiser inextricably links Opposer's **BUDWEISER** brand to beer making, not wine making. Unlike **WINEBUD**, which is transparently composed of two common English nouns, **BUDWEISER** is obviously not composed of any words in the English language, being a Germanic place name, as well as a surname.

*App. Br.*, 41 TTABVue 10.

Applicant claims its analysis also applies to Opposer's **BUD** mark, which Applicant says is an abbreviation of **BUDWEISER**, *id.* at 11, and that Applicant's **WINEBUD** mark "is a fanciful coined compound noun in which the BUD has everything to do with viticulture, and nothing to do with a small town in Bohemia. Wine drinkers in the United States would naturally regard the latter half of the fanciful compound mark **WINEBUD** as connoting the bud of a vine, not as connoting **BUDWEISER** the beer brand or the **BUD** Family of Marks." *Id.* at 12.

---

[9] This is apparently a misstatement. Evidence submitted by Applicant indicates that "Budweiser" is "an adjective in German language [*sic*] describing something or someone *from the Bohemian city Budweis* (České Budějovice), which until 1919 was part of the Austrian Empire" App. Not. of Reliance, 34 TTABVue 21–23 (http://www.websters-online-dictionary.org/ (July 25, 2011)) (emphasis added). The same source goes on to note that **BUDWEISER** is "a trademark for two beer companies," one of which is Opposer. *Id.*

We are not persuaded by Applicant's arguments. We find it very unlikely that relevant consumers perceive Opposer's famous **BUDWEISER** trademark as suggesting a connection to what Applicant admits is "a small town in Bohemia." There is no evidence in this record to suggest that any substantial number of United States beer consumers have even heard of České Budějovice (or its formerly used German name, Budweis), or that they associate the **BUDWEISER** trademark with that town, rather than with Opposer and its products. Thus, even if the town formerly known as Budweis was the origin of the **BUDWEISER** trademark more than 150 years ago, there is no evidence that United States consumers are now likely to associate the mark with that geographical location, particularly in light of Opposer's very long and extensive use of **BUDWEISER** as a trademark in this country, and the strong recognition, as we have discussed in considering the factor of fame, of **BUDWEISER** as a trademark for beer.

Further, any argument that **BUDWEISER** is geographically suggestive does not implicate Opposer's **BUD** mark, which, as noted, is the mark most relevant to this proceeding.[10] Even if we were to find that **BUDWEISER** suggests something coming from a town formerly called Budweis, we could not simply assume that **BUD** shares the same geographic connotation. There is no evidence of a town named "Bud," or that any-

---

[10] We do not suggest by this that we give credence to any argument by Applicant that either **BUDWEISER** or **BUD** suggests a geographic origin and is therefore a conceptually weak mark. Given the strong association of the long-used and heavily-promoted **BUD** and **BUDWEISER** brands with Opposer and its products, we find it very unlikely that consumers in this country — even those who may be aware of a town that used to be called Budweis — would associate Opposer's marks with a geographic location. Further, to the extent Applicant suggests that Opposer's registered marks are descriptive or geographically descriptive, such arguments are inappropriate in the absence of a counterclaim to cancel them. Trademark Rule 2.106(b)(2)(ii).

one has ever referred to České Budějovice as "Bud." Applicant's argument is essentially that **BUD** refers to **BUDWEISER** and **BUDWEISER** refers to someone or something from Budweis, and Budweis is the former name of České Budějovice, which is a small Czech town. Even if each of Applicant's premises is correct, we find this chain too attenuated to conclude that United States consumers would understand **BUD** to refer to something from the town formerly known as Budweis.

As for its own mark, Applicant argues that consumers would not associate **WINEBUD** with Opposer or its goods because

> Applicant's mark is **WINEBUD**.
>
> Wine comes from grapes. Grapes grow on vines. Vines have buds.
>
> "Vine bud" is a recognized term in the field of viticulture.

*App. Br.*, 41 TTABVue 9. As authority for the last premise, Applicant cites a single mention of the term "vine bud" in a publication touting itself as "The Industry's Leading Print Publication for Wineries and Growers."[11] *See* Bibiana Guerra, *Bud Fruitfulness: Let There Be Light*, Wine Business Monthly (June 15, 2009), *App. Not. of Reliance*, Exh. 1, 34 TTABVue 8. The problem with this argument is that a mention in a single winery trade article is insufficient for us to find that "vine bud" is "a recognized term in the field of viticulture," let alone a term recognized by the usual purchasers of wine or beer. *See Opp. Seventh Not. of Reliance*, Exh. 1–4 (searches of online, general-purpose dictionaries showing no definition for "vinebud"). Besides, the mark at issue is

---

[11] The actual sentence is: "Vine buds are *compound buds* comprised of one *primary bud* — the one which normally forms the shoot — and two secondary buds, which do not normally push."

**WINEBUD**, not vine bud, and there is no evidence that **WINEBUD** has any meaning whatsoever. Although consumers might well view **WINEBUD** as a combination of WINE and BUD, they are more likely to understand WINE as being the generic name for the beverage, and BUD, because of the fame of Opposer's mark, as the source-identifying portion of the mark, *i.e.*, as showing origin in Opposer.

We agree with Applicant that we must consider its mark in its entirety when assessing its overall similarity to Opposer's mark. *App. Br.*, 41 TTABVue 9. That said, consumers who encounter Applicant's mark would readily recognize its constituent terms, "wine" and "bud." As Applicant recognizes, when a compound term comprises two ordinary English words, consumers often recognize them as such, rather than considering the combination to be a fanciful term with no meaning at all. *Id.* at 10 ("**WINEBUD** … is transparently composed of two common English nouns"). As a result, whether such a mark appears as one word or two often has little or no effect on consumers' impression of it. *See, e.g., Seaguard Corp. v. Seaward Int'l, Inc.*, 223 USPQ 48, 51 (TTAB 1984) (**SEA GUARD** and **SEAGUARD** are "essentially identical"); *In re Best Western Family Steak House, Inc.,* 222 USPQ 827 (TTAB 1984) (finding **BEEF-MASTER** for restaurant services and **BEEF MASTER** for frankfurters and bologna "practically identical"); *cf. Minn. Mining & Mfg. Co. v. Addressograph-Multigraph Corp.*, 155 USPQ 470, 472 (TTAB 1967) ("[i]t is almost too well established to cite cases for the proposition that an otherwise merely descriptive term is not made any less so by merely omitting spaces between the words"). This is especially true of Applicant's mark, in which the first term is "WINE." Consumers of alcoholic beverages would im-

mediately recognize this generic term, especially when used on wine. And it is beyond dispute that descriptive or generic terms (such as WINE when used in connection with "wines") serve little source-identifying function. *In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1946 (Fed. Cir. 2004) ("Because ALE has nominal commercial significance, the Board properly accorded the term less weight in assessing the similarity of the marks under *DuPont*. As a generic term, ALE simply delineates a class of goods." (citing *In re Nat'l Data*, 224 USPQ2d at 751)). Thus, although we recognize that WINE is and remains a part of Applicant's mark, consumers are not likely to view it as a source-distinguishing element, but rather as the name of the goods. To the contrary, the dominant part of Applicant's mark is clearly "BUD," which is identical in all respects to Opposer's registered **BUD** mark, and that is the term on which Applicant's customers are likely to focus. Thus, when considered in their entireties, the marks are highly similar. Despite the fact that "[w]ine comes from grapes[, g]rapes grow on vines[, and v]ines have buds," *App. Br.*, 41 TTABVue 9, customers are more likely to associate Applicant's mark with Opposer and its famous **BUD** mark than with viticulture.[12]

We conclude that the dominant element in Applicant's mark is identical in appearance and sound to the entirety of the mark in Opposer's **BUD** registration, and that the

---

[12] The parties also dispute whether Applicant's mark fits an alleged "popular branding convention that places the generic term of a mark first, followed by the source identifying term," *Opp. Br.*, 40 TTABVue 25, 34, or whether its word pattern is the result of "a French grammatical rule." *App. Br.*, 41 TTABVue 11–13; *App. Not. of Reliance*, 35 TTABVue Exh. 2–3, 6–7. Their evidence and argument on this point are unenlightening, and we see no need to resolve the dispute. The question at hand is whether and to what extent the relevant consumers would perceive the marks as similar. Even if there were evidence that those consumers are aware of branding conventions or French grammatical rules (which there is not), the relevance of these points is tenuous, at best, particularly in view of the fame of the **BUD** mark.

additional, generic word WINE in Applicant's mark is insufficient to distinguish it from Opposer's **BUD** mark. Although Applicant suggests that BUD has different meanings in the parties' respective marks — Applicant's BUD being associated with viticulture and Opposer's with a town in the Czech Republic — there is no persuasive evidence of either proposition. Nor is there persuasive evidence that consumers would understand Applicant's mark to have the meaning of "vine bud," or even to be familiar with this term. While the parties' marks are not identical, the additional generic element in Applicant's mark does not distinguish it from Opposer's. Comparing the marks in their entireties, we conclude that Applicant's **WINEBUD** mark is highly similar to Opposer's **BUD** mark, which favors a finding that confusion is likely.

### C. The Similarity or Dissimilarity and Nature of the Goods, Channels of Trade, and Classes of Consumers; Conditions of Sale

In comparing the parties' goods, "[t]he issue to be determined . . . is not whether the goods of plaintiff and defendant are likely to be confused but rather whether there is a likelihood that purchasers will be misled into the belief that they emanate from a common source." *Helene Curtis Indus. Inc. v. Suave Shoe Corp.*, 13 USPQ2d 1618, 1624 (TTAB 1989). It is not necessary that the parties' goods be the same or even competitive to support a finding of likelihood of confusion. It is sufficient if the goods are related in some manner or that the conditions surrounding their marketing are such that they would be encountered by the same persons under circumstances that could, in light of the similarity of the marks, give rise to the mistaken belief that the goods come from or are associated with the same source. *Coach Servs.*, 101 USPQ2d at 1722 (citation omitted); *see also In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1786 (TTAB

1993).

In considering these *du Pont* factors, we emphasize that the goods at issue are those which are set out in the subject application and the pleaded registration. *Octocom Sys. Inc. v. Houston Computers Servs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). The question in an opposition is not whether the applicant may use a mark as it actually does or intends to do, but whether the applicant is entitled to the registration it seeks. For this reason, we must give "full sweep" to Applicant's goods as they are identified in the subject application. *Paula Payne Prods. Co. v. Johnson Publ'g Co., Inc.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973). And absent any explicit restriction in the application or registration, we must presume the parties' identified goods to travel through all normal channels of trade for goods of the type identified, and we must consider them to be offered and sold to all of the usual customers for such goods. *Coach Servs.*, 101 USPQ2d at 1722; *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981) (citing *Kalart Co., Inc. v. Camera-Mart, Inc.*, 258 F.2d 956, 119 USPQ 139 (CCPA 1958)).

The goods identified in the subject application are "alcoholic beverages except beers."[13] Opposer's **BUD** mark is registered for "beer." The parties' goods are obviously

---

[13] As fully set out, Applicant's goods are:

> alcoholic beverages except beers; wines and still wines and sparkling wines; beverages containing wine, namely, sparkling fruit wine and still fruit wine; [and] ready to drink alcoholic beverages except beers.

Although most of the parties' arguments focus on Applicant's intended use of its mark on wine, the goods recited in the subject application are considerably broader. *Tuxedo Monopoly, Inc. v. Gen. Mills Fun Group, Inc.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981) (relevant goods are those recited in the application, notwithstanding actual or intended use of the mark

(continued...)

similar to the extent that they are all alcoholic beverages, although they are different because of Applicant's explicit exclusion of beer from its identification of goods. Opposer notes that we have often found various alcoholic beverages — including beer and wine — to be related for purposes of a Section 2(d) analysis. *See Opp. Br.*, 40 TTABVue 35. While Opposer does not itself produce or sell wine, it has submitted evidence that some of its competitors produce both beer and wine. *Fishbeck Test.* 38 TTABVue 44–45; *Fishbeck Dec.* ¶ 41. Opposer also currently sells flavored malt beverages and once sold a wine cooler, albeit under a different mark. *Fishbeck Test.* TTABVue 17; *Fishbeck Dec.* ¶ 40. Opposer also points to what it characterizes as "numerous" third-party registrations covering both wine and beer. *Opp. Second Not. of Reliance*, 26 TTABVue 6–53.

Applicant, pointing out that there is no actual overlap between the parties' identified goods, argues that there is no "evidence that Opposer may expand its use of its BUD-formative marks to Applicant's goods or vice versa." *App. Br.* at 9. While acknowledging Mr. Fishbeck's testimony that some of Opposer's competitors sell both beer and wine, Applicant notes that there is no evidence that those competitors ever sell beer and wine under the same brand. *App. Br.*, 41 TTABVue 14 (citing *Fishbeck Test.*, 39 TTABVue 100–106). Finally, Applicant argues that because of Opposer's long use of its **BUD** and **BUDWEISER** marks on beer, consumers would not expect that wine sold under a similar mark originates from or is otherwise connected with Opposer:

on narrower or different goods). Because Applicant's first-identified item ("alcoholic beverages except beers") encompasses all of the remaining ones (each being a type of alcoholic beverage other than beer), it is this broadly defined item that is actually at issue. Nonetheless, our decision would be no different if we considered Applicant's goods to be limited to wine.

> As for Opposer itself, it began brewing beer under the trademark **BUDWEISER** in 1876[.] Since approximately 1895, Opposer has promoted **BUDWEISER** beer under the name **BUD**. Thus, for well over a century, Opposer has had the opportunity to extend its **BUDWEISER** and **BUD** trademarks to wines, had it wished to do so. Yet in fact, Opposer admits that it sells no wine under its alleged **BUD** Family of Marks, nor does it sell any wine coolers, cider, malt liquor under its alleged **BUD** Family of Marks. Nor does any evidence of record in this case suggest or imply that Opposer has ever sold wine under any of the **BUD** Family or [*sic*] Marks or applied for any trademark for wine including the term **BUD**.

*App. Br.,* 41 TTABVue 14 (citations omitted, emphasis added).

As Opposer notes, this Board has found beer and wine related on a number of occasions. *See In re Kysela Pere et Fils Ltd.*, 98 USPQ2d 1261 (TTAB 2011); *In re Sailerbrau Franz Sailer*, 23 USPQ2d 1719 (TTAB 1992); *In re Gebr. Eckel GMBH*, 196 USPQ 198 (TTAB 1976) (mem.); *Krantz Brewing Corp. v. Henry Kelly Importing & Distrib. Co. Inc.*, 96 USPQ 219 (Exm'r in Ch. 1953); *Fruit Indus., Ltd. v. Ph. Schneider Brewing Co.*, 46 USPQ 487 (Comm'r Pats. 1940). Moreover, beer has been held related to other alcoholic beverages by both this Board and our reviewing courts. *E.g., In re Chatam Int'l*, 71 USPQ2d at 1947–48 (Fed. Cir. 2004) ("Indeed, the goods [tequila and beer or ale] often emanate from the same source because 'both are alcoholic beverages that are marketed in many of the same channels of trade to many of the same consumers.'") (quoting *Majestic Distilling*, 65 USPQ2d at 1204 (malt liquor related to tequila given the identity of trade channels despite the fact that "malt liquor is a brewed product, whereas tequila is distilled")). In fact, the parties have not cited any precedential decision holding beer and wine unrelated for purposes of a likelihood of confusion analysis, and we are not aware of any. While each case must be decided on its own record, these

decisions make clear that beer and wine (among other alcoholic beverages) certainly can be, and frequently are, found to be related.

As evidence that the goods are related, Opposer submitted nine third-party registrations in which the same mark was registered for both beer and wine. *Opp. Not. of Reliance*, 26 TTABVue 7–53. While they are not evidence that the registered marks are used on a commercial scale or that they are known to the public, third-party registrations based on use in commerce and covering different goods or services serve to suggest that those goods or services are of a type which may emanate from a single source. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1140 (TTAB 2012); *see also H.D. Lee Co. v. Maidenform Inc.*, 87 USPQ2d 1715, 1724 n. 27 (TTAB 2008). Nonetheless, three of the third-party registrations (Nos. 2721021, 3224004, and 3115035) have been cancelled, and cannot be used for this purpose. *See Sunnen*, 1 USPQ2d at 1747. The six remaining registrations provide some evidence that beer and wine are goods "of a type which may emanate from a single source," *L'Oreal*, 102 USPQ2d at 1140, although, because there is no indication that these registrations are merely representative, rather than the total number of such registrations, the small number of registrations is not strong support for that proposition to be applied in this case.

As previously noted, Mr. Fishbeck testified that some of Opposer's competitors produce both wine and beer, and that Opposer once produced a wine cooler, although those products were sold under different marks, and the record is silent as to whether Opposer's corporate name was featured on the packaging or in advertising. Thus, we cannot ascertain whether purchasers were aware that those goods originated from the

23

same source. Nonetheless, it is clear that beer and other alcoholic beverages (including wine) are sold to consumers in many of the same channels of trade, including retail outlets such as liquor stores, supermarkets, convenience stores, restaurants, and bars, and Opposer's unrefuted testimony is that beer and wine are competitive products. *Fishbeck Dec.* ¶¶ 37–38, *Fishbeck Test.*, TTABVue 45–47. While there are certainly many expensive wines — and at least some expensive beers — neither beverage is inherently expensive. The record indicates that Opposer's beer sells at retail for approximately $ 6.00 – $ 8.00 for a six-pack and, according to Mr. Fishbeck, "the vast majority of wine sold in the United States retails for less than $ 11.00 per bottle." *Fishbeck Dec.* ¶¶ 42–43. Because wine and beer can be sold at low price points, many customers will not exercise great care in their purchases of beer and wine. Thus, although the selection of beer and wine is sometimes subject to careful purchasing decisions, such products can — especially at low price points — be an impulse purchase, making it more likely that a hurried customer would assume a connection between the source of such products sold under similar trademarks. *Recot*, 54 USPQ2d at 1899 ("When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care.").

As Applicant notes, it is clear that beer is different from wine (and other alcoholic beverages). Moreover, because Applicant's goods explicitly exclude beer, its goods and Opposer's do not actually overlap. *App. Br.*, 41 TTABVue 14. Yet that fact is of little consequence; as previously stated, goods need not be identical or even competitive in

order to support a finding that confusion is likely. The question is whether, under all the circumstances, consumers encountering the goods sold under these marks would mistakenly believe that they share or are affiliated with or sponsored by a common source. *In re Melville Corp.*, 18 USPQ2d 1386, 1388 (TTAB 1991). In this case, Mr. Fishbeck testified that Opposer considers its beer to be in competition with "liquor, wine [and] spirits," *Fishbeck Test.*, 39 TTABVue 45–46, 54, and Applicant does not contend otherwise.

Applicant further points out that Opposer has sold beer under its **BUDWEISER** and **BUD** marks "for well over a century," and has thus "had the opportunity to extend its . . . trademarks to wines, had it wished to do so." *App. Br.* at 10. While true, this argument makes little difference in our likelihood of confusion analysis. The question is not whether Opposer in fact sells the same goods as Applicant, but whether consumers are likely to mistakenly *think* that it does. We conclude in this case that beer and other alcoholic beverages, including wine, are related, and that their purchasers and channels of trade overlap. Although Opposer has never sold wine under its **BUD** mark, the fame of that mark makes it likely that purchasers seeing a similar "BUD" mark on wine would think that Opposer has expanded its product line to include wine. The fact that Opposer has not taken advantage of its "opportunity" to sell wine under its famous **BUD** mark does not provide Applicant an opportunity to register its own mark for use on wine (and other alcoholic beverages) if confusion is likely to result. These factors of the relatedness of the goods, overlap in channels of trade and classes of consumers, and conditions of purchase support a finding that confusion is likely.

25

### D. The Blair Survey

Opposer's expert, Edward A. Blair, Ph.D., conducted a survey and found that 24 percent of survey respondents indicated their belief that a wine[14] sold under the **WINEBUD** mark would be put out by, affiliated or connected with, or approved or sponsored by Opposer. *Expert Report of Edward A. Blair, Ph.D.*, 37 TTABVue 110 (Nov. 21, 2010) (attached to Dr. Blair's testimony as Exh. 1) ("*Blair Rpt.*").[15] Applicant raises a variety of concerns about the design and execution of the Blair survey, including that Dr. Blair had never conducted a survey involving a wine trademark; that only a "small minority of the total number of respondents" indicated a belief that wines sold under Applicant's trademark would be produced by or affiliated with Opposer"; that the 400 participants in the survey were too few and an "infinitesimal number of consumers of beer and wine products"; and that Opposer's survey may not be reliable because it was conducted over the internet.[16] *App. Br.*, 41 TTABVue 15–17.

To the extent Applicant contends that the Blair survey should not be admitted into

---

[14] Although Applicant's identified goods include the considerably broader category of "alcoholic beverages except beers," the survey focuses on Applicant's intended use of its mark on wine. *See Blair Rept.*, App'x 3, 37 TTABVue 124–149 (survey questionnaire).

[15] The survey also asked questions leading to Dr. Blair's conclusion that 37 percent of respondents were *reminded* of Opposer or its brand by Applicant's **WINEBUD** mark, regardless of whether they were confused as to the source of the product, *Blair Rept.*, 37 TTABVue 110, and that 45 percent of respondents (90 out of 201) "associated the name **WINEBUD** with Anheuser-Busch or its brands," *Blair Rept.*, *id.* at 111, referring to all of the respondents who indicated that they would be confused, or reminded of Opposer, or both. While these additional findings might be relevant for other purposes, such as Opposer's dilution claim, with respect to Opposer's Trademark Act § 2(d) claim, "[t]he fact that one mark may bring another mark to mind does not in itself establish likelihood of confusion as to source." *In re P. Ferrero & C. S.P.A.*, 479 F.2d 1395, 178 USPQ 167, 168 (CCPA 1973). Accordingly, in considering the ground of likelihood of confusion, we address Dr. Blair's finding that 24 percent of the respondents exhibited confusion under the conditions of the survey.

[16] Applicant raises other issues which do not require discussion.

evidence, we disagree. Along with most courts, the Board has generally treated the type of survey flaws alleged by Applicant as affecting the probative weight of a survey, rather than its admissibility. *E.g., Nat'l Pork Bd. v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1484–85 (TTAB 2010). Accordingly, we see no reason to exclude the Blair survey from the record.

As for the qualifications of Opposer's expert, *see App. Br.*, 41 TTABVue 15, the record indicates that Dr. Blair was well-qualified by his knowledge, education, and experience to conduct this survey, despite having never previously conducted a survey specifically involving a trademark intended for use on wine. *Blair Test.*, 37 TTABVue 9–12; *Blair Rpt.* App'x 1, 37 TTABVue 114–121 (*curriculum vitae* listing Dr. Blair's education, teaching positions, publications, and professional experience); App'x 2, *id.* at 123 (list of recent lawsuits in which Dr. Blair offered testimony); *see* FED. R. EVID. 702. Applicant points to no facts or circumstances suggesting that a survey about wine trademarks differs significantly from any other trademark survey Dr. Blair has conducted, nor has Applicant alleged any particular error attributable to Dr. Blair's lack of experience with wine surveys. We conclude that Dr. Blair was qualified to conduct the survey and to testify as an expert in this case. We further note that the survey was appropriate in its general design. The likelihood of confusion part of the survey follows the familiar "Eveready"[17] model, a widely used and well-accepted format for likelihood of confusion surveys. *See e.g.*, *Starbucks U.S. Brands LLC v. Ruben*, 78 USPQ2d 1741, 1753

---

[17] Named for a case in which it was used with approval, *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366, 188 USPQ 623 (7th Cir. 1976).

(TTAB 2006) (approving use of an Eveready survey); *see generally,* J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32:174 (4th ed. updated 2015) (discussing the acceptability of the Eveready format in likelihood of confusion disputes).

We also reject Applicant's suggestion that a 24 percent rate of potential confusion as to the source or affiliation of Applicant's wine would be insufficient to support a finding that confusion is likely. As evidence that confusion is likely, a higher rate of confusion will always be better than a lower one, but the Trademark Act does not set a threshold percentage of relevant consumers who must be confused in order to bar registration under Trademark Act § 2(d). While survey results showing *de minimis* confusion in the relevant population would not support an inference that confusion is likely, *du Pont*, 177 USPQ at 567 (factor number twelve), courts have often found survey results probative of likely confusion even when they suggest that far less than 50 percent of the relevant population is likely to be confused. For example, in *J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889 (Fed. Cir. 1991), the Court of Appeals for the Federal Circuit held that a survey in which 30 percent of respondents indicated confusion should be given appropriate weight as evidence that confusion is likely. *Id.* (affirming a finding of likelihood of confusion). And in a number of other cases, courts have held that surveys with results comparable to Opposer's 24 percent rate of confusion — or lower — support a finding that confusion is likely. *E.g.*, *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 208 USPQ 384, 390 (5th Cir. 1980) (a showing that "[a]pproximately 15 percent of the individuals surveyed associat-

28

ed the" defendant's mark with plaintiff "indicate[s] a high possibility of confusion"); *James Burrough, Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 192 USPQ 555, 565 (7th Cir. 1976) ("Though the percentage of likely confusion required may vary from case to case, we cannot consider 15 percent, in the context of this case, involving the entire restaurant-going community, to be *de minimis.*"); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 101 USPQ2d 1487, 1502–03 (S.D.N.Y. 2011) (finding survey results showing 22.5 and 27.8 percent confusion "suggestive of actual confusion"), *aff'd*, 511 F. App'x 81 (2d Cir. 2013); *McNeil-PPC Inc. v. Granutec Inc.*, 919 F. Supp. 198, 37 USPQ2d 1713, 1716 (E.D.N.C. 1995) (two surveys showing net confusion rates of 28 and 21 percent were "certainly sufficient to draw the conclusion that there is a likely chance of confusing the two products"); *Miles Labs., Inc. v. Naturally Vitamin Supplements, Inc.*, 1 USPQ2d 1445, 1465 (TTAB 1986) (survey showing 18 percent confusion corroborates finding of likely confusion; "surveys disclosing likelihood of confusion ranging from 11% to 25% have been found significant"); *see* MCCARTHY, § 32:188, quoted in *In re Spirits Int'l N.V.*, 86 USPQ2d 1078, 1089 n. 17 (TTAB 2008), *rev'd on other grounds*, 563 F.3d 1347, 90 USPQ2d 1489 (Fed. Cir. 2009) ("Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion"); Lawrence Evans & David Gunn, *Trademark Survey Evidence*, 20 Tex. Tech. L. Rev. 1, 22 (1989) (noting "an emerging national consensus that a showing of ten percent or more is sufficient to establish likelihood of confusion"). We conclude that the 24 percent level of confusion shown in the results of the Blair survey is not *de minimis*, and that — if it is representative of the potential rate of confusion

among the universe of prospective purchasers — it supports Opposer's claim.

Applicant also argues that Opposer's survey is suspect because it was conducted online. *App. Br.*, 41 TTABVue 16–17. Applicant points out a number of possible shortcomings of online surveys, and contends that the only reason Dr. Blair chose that survey method was because it was "quicker and cheaper"[18] than other means. *App. Br.* at 13. While there are drawbacks to conducting a survey online, *see* Gabriel M. Gelb & Betsy D. Gelb, *Internet Surveys for Trademark Litigation: Ready or Not, Here They Come*, 97 Trademark Rep. 1073, 1083–84 (2007), there is no perfect mode of market research with which to compare it. All means of conducting a survey (*e.g.*, telephone, in-person, mail, online) have inherent advantages and disadvantages and none is ideal in every respect.[19] *See id*. at 1082, 1084 (advantages of online surveys); Isaacson, Hibbard, and Swain, *Why Online Surveys Can Be a Smart Choice in Intellectual Property Cases*, 26 IPL Newsl. 1, 12 (Spring 2008). Applicant offers no convincing reason why we should give Opposer's survey reduced weight or "no weight at all,"[20] *App. Br.*, 41

---

[18] As Opposer notes, *Reply Br.*, 42 TTABVue 13 n. 4, what Dr. Blair actually said was that in his opinion, an internet survey was "suitable" under the circumstances, as well as being "quicker and cheaper." *Blair Test.*, 37 TTABVue 69. We see nothing wrong with the consideration of timeliness or price as factors in designing a survey if the design is otherwise appropriate.

[19] For instance, Applicant argues that a mall-intercept survey would have been more appropriate in this case than the internet survey Dr. Blair conducted. *App. Br.* 41 TTABVue 17. Yet "[a] mall-intercept survey, while clearly admissible and a recognized survey method, is entitled to limited probative weight because it is not based on a random sample and the results cannot be projected to the entire universe of relevant purchasers." *Spirits Int'l*, 86 USPQ2d at 1089. By contrast, the sample in the Blair Survey "was randomly selected from the American Consumer Opinion panel . . . and was balanced to represent U.S. Census data by geography, gender, age, income and ethnicity." *Blair Rept.* 37 TTABVue 105.

[20] Applicant argues that an in-person survey would have been better because respondents could have been shown "a mock up visual of a bottle of wine with a label bearing the mark at issue,"

(continued...)

TTABVue 19, on account of the means used to conduct it. While we are mindful of the limitations and advantages of various types of surveys, it cannot be said that Opposer's survey was unsound merely because it was conducted online.

Applicant further contends that the size of the sample used in Opposer's survey was too small to provide meaningful results in light of the large number of potential customers (*i.e.*, wine or beer purchasers) in the U.S. market. *App. Br.*, *id.* at 16. Opposer responds — citing Dr. Blair's testimony — that a sample size of 400 can provide significant results. *Reply Br.*, 42 TTABVue 13 (citing *Blair Test.*, 37 TTABVue 19–20). We find both arguments somewhat lacking. To the extent Applicant contends that a sample which is quite small *relative to* a very large population cannot provide meaningful results, we disagree. While a larger sample is better in principle than a smaller one, the effect is not linear; each additional survey participant increases a survey's precision, but by a smaller increment than the previous addition. Above a certain point, the benefit gained from adding additional respondents is negligible. David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, 243 (3d ed. Fed. Jud. Ctr. 2011) (*Reference Guide*). As a result, a well-

---

while Dr. Blair simply used the word **WINEBUD** in capital letters on a blank background as a stimulus. *App. Br.*, 41 TTABVue 17. What Applicant describes is not a shortcoming of internet surveys; we have little doubt that Dr. Blair *could* have used a "visual of a bottle of wine" as a stimulus in his online survey. But more importantly, the stimulus Dr. Blair did use was entirely appropriate. This proceeding is about whether Applicant may register as a trademark the term **WINEBUD** without limitation to any particular style, color, or size for use on (among other alcoholic beverages) wine. Had Dr. Blair focused his survey on any particular presentation of Applicant's mark on a particular bottle, box, or other container of a particular wine, he would have unnecessarily restricted the survey to that presentation, although the registration Applicant seeks is not so limited. *Miles Labs.*, 1 USPQ2d at 1452 ("Applicant's argument that the trade dress of its [labels and those of Opposer] underscore the clear differences existing in the commercial impressions of the marks is without merit.").

designed and conducted survey using a representative sample can permit valid infer-ences to be drawn about a very large population by studying only a relatively small fraction of it. *Id.* at 246. Thus, the opinions of several hundred people might indeed be probative of the opinions of millions.

Nonetheless, sample size does affect the analysis of survey results, particularly when the sample is small. In response to Applicant's argument, Opposer quotes Dr. Blair's testimony "that a survey sample size of 400 respondents is 'a very common number' within the industry for a survey of this type." *Reply Br.*, 42 TTABVue 13. However, although Dr. Blair's survey did involve a total of 400 participants, they were split into two groups: a test group of 201 respondents, using Applicant's **WINEBUD** mark as a stimulus; and a control group of 199 respondents, using the made-up mark **WINEBLOSSOM** as a stimulus. In effect, Dr. Blair conducted two surveys, only one of which (the test group) is directly relevant to whether consumers are likely to be con-fused by Applicant's use of **WINEBUD** for wine. Use of a control is sound practice be-cause it tends to validate the survey itself,[21] but those respondents who only considered a spurious mark cannot be counted as part of the group reporting a 24 percent rate of

---

[21] In this case, the zero percent rate of confusion in the control group (using **WINEBLOSSOM** as a stimulus) suggests that the 24 percent rate of confusion in the test group was unlikely to have been the result of anything *other* than the use of **BUD** as part of Applicant's mark. *Blair Test.*, 37 TTABVue 22–23. *See* Eugene P. Ericksen & Melissa A. Pittaoulis, *Control Groups in Lanham Act Surveys*, 104 Trademark Rptr. 744, 751 (2014) ("A good control is one that holds constant all noninfringing elements of the product/trademark.").

Dr. Blair's choice of BLOSSOM as a stand-in for BUD in the control stimulus was sound. Alt-hough BLOSSOM is longer than BUD, the two terms share the same initial consonant, as well as a similar, agricultural, meaning. As discussed, Applicant argues that BUD in its mark — but not in Opposer's — has a viticultural connotation. Thus it is notable that the test cell, using the related term BLOSSOM, rather than BUD, showed no confusion at all.

confusion with respect to Applicant's **WINEBUD** mark. The survey that answered that question was the survey of the 201 test-group subjects. This leaves us with a question that Dr. Blair did not address: How precise is the result of a survey using 201 test subjects? The answer is not entirely clear from this record, but we can make some useful observations, based on case law and scholarly publications.

Selection of an appropriate sample depends on a variety of factors, and not surprisingly, the weight given to surveys of various sizes differs from case to case. *See, e.g.*, *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 217 USPQ 988, 997 n. 4 (5th Cir. 1983) (criticizing survey on suggestiveness for various reasons including that "survey samples such as these — 100 women in each of four randomly selected cities — may not be adequate in size to prove much of anything"); *Schieffelin & Co. v. Jack Co. of Boca, Inc.*, 850 F. Supp. 232, 31 USPQ2d 1865, 1875–76 (S.D.N.Y. 1994) (survey of 176 subjects admitted "in view of the large percentage of people indicating confusion"); *Spirits Int'l*, 86 USPQ2d at 1089 (TTAB 2008) ("where as here, the number of participants is rather small (231), the survey provides limited information about consumer views"); *Zimmerman v. Nat'l Ass'n of Realtors*, 70 USPQ2d 1425, 1435 (TTAB 2004) (genericness survey in which only 10% of 96 respondents considered term to be a trademark "was too low to accord much weight to the study results").

Contending that the sample size in this case was adequate, Opposer notes that in *Starbucks U.S. Brands LLC v. Ruben*, 78 USPQ2d 1741 (TTAB 2006), the Board found a survey of 200 respondents "reliable and therefore of probative value on the issue of likelihood of confusion." *Opp. Br.*, 42 TTABVue 13 (citing *Starbucks*, at 1753). Opposer

also cites a Seventh Circuit case in which a survey of 500 subjects was deemed "fairly and scientifically conducted." *James Burrough, Ltd.*, 192 USPQ at 556. But the sample in that case was nearly two and one-half times as large as Opposer's test cell.

The problem with a small sample is the effect of sampling error — the uncertainty inherent in the observation of a sample selected from a larger population due to random variation. *Reference Guide* at 243 ("An estimate based on a sample is likely to be off the mark, at least by a small amount, because of random error."). The smaller the sample, the larger the sampling error. *See* 1 Jacob Jacoby, TRADEMARK SURVEYS 892–95 (2013). In other words, the observed confusion is likely to differ more widely from the true level of confusion in a small sample than in a larger one, thus providing a less reliable estimate of confusion in the larger universe. *Id.*; *Reference Guide* at 243–44. The question is one of degree, but at some point, a small sample may provide results potentially so low or so imprecise as to be of little or no value in inferring the rate of confusion among all relevant consumers. This imprecision can be calculated and expressed as a confidence interval at a given confidence level.[22] 1 Jacob Jacoby, TRADEMARK SURVEYS 894.

Dr. Blair did not include in his report or testimony a confidence interval calculated

---

[22] For instance, the results of a survey might be reported to show 35 percent confusion ± 2.5 (the confidence interval) at a 95 percent confidence level. (Ninety-five percent is a frequently-used confidence level in trademark surveys. Lawrence Evans, Jr. & David Gunn, *Trademark Survey Evidence*, 20 Texas Tech 1, 8 (1989).) From those results, one could expect that if the survey were to be repeated, 19 out of 20 times the "[confidence] intervals from repeated samples would cover the true value." *Reference Guide* at 247. A smaller sample showing the same rate of confusion would result in a wider interval at the same confidence level (*e.g.*, 35 percent ± 7), indicating less precise results.

from the reported results.[23] But based on published statistical tables, we can see that the lower bound of the confidence interval for this survey is between 17.5 percent and 18.3 percent.[24] In other words, even construing the survey in the best light for Applicant, the results suggest that at the 95 percent confidence level, *at least* 17.5 percent of the relevant population is likely to be confused by Applicant's use of its mark for wine. While that figure would not be considered a high level of confusion, neither is it negligible or *de minimis. See, e.g., James Burrough, Ltd.*, 192 USPQ at 565 (finding an observed 15% rate of confusion legally significant). Thus, we reject Applicant's contention that Dr. Blair's sample was too small to produce meaningful results. Although a larger sample may have enabled us to be confident of a likely level of confusion closer to the observed 24 percent, even at the lower end of the confidence interval, Dr. Blair's survey results are still probative, although not strong, evidence that confusion is likely.[25]

---

[23] Although it is not always provided with surveys in Board proceedings, a confidence interval may be useful in considering survey results (at least when a random sample is chosen), particularly when the sample size is somewhat small. "[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 594 (1993); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.*, 32 USPQ2d 1001, 1006 (S.D.N.Y. 1994) (not reported in F. Supp.) ("one must employ statistical confidence tests when making a claim regarding the projectability of a sample or survey result in order to infuse that result with any meaning"). *See* Larry Jones, *Developing and Using Survey Evidence in Trademark Litigation*, 19 Mem. St. U.L. Rev. 471 (1989) ("the 'confidence level' and 'sampling error' associated with [a] survey reflects [its] credibility").

[24] *See* 1 Jacob Jacoby, TRADEMARK SURVEYS 895 (2013). Jacoby's table shows confidence ranges calculated for a 95% confidence level at various sample sizes and observed results. For a sample size of 200, the confidence range is ± 5.7% when the observed value is 20% and ± 6.5% when the observed value is 30%. The observed 24% level of confusion in the Blair study falls between 20% and 30%, so the range of error for Opposer's survey falls between ± 5.7% and ± 6.5%.

[25] We hasten to add that a survey is neither required nor expected in a Board proceeding. Most Board cases involve only indirect evidence of consumer perception.

### E. Balancing the Factors

Based on the record, we have found Opposer's **BUD** mark to be famous, and that Opposer's mark is similar to Applicant's. Applicant's wine is related to Opposer's beer and the parties' products are sold in some of the same channels of trade to the same classes of customers. The goods are purchased, inter alia, by ordinary consumers who are unlikely to exercise care in their purchases. We therefore conclude that use of Applicant's **WINEBUD** mark on wine and other alcoholic beverages is likely to cause confusion with Opposer's registered and previously used **BUD** mark for beer, a conclusion that is further corroborated by the Blair survey.

## V. Dilution

Having determined that Applicant is not entitled to registration under Trademark Act § 2(d), it is unnecessary to consider Opposer's dilution claim.

*Decision*: The opposition to registration of Application Serial No. 79065427 is sustained on the ground of likelihood of confusion under Section 2(d) and registration to Applicant is refused.